**ORIGINAL**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| DNC PARKS & RESORTS AT YOSEMITE, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | FILED <br> SEP 17 2015 <br> U.S. COURT OF FEDERAL CLAIMS <br><br> No. _____ <br><br> 15-1034 C <br> Judge _____ |

## COMPLAINT

### NATURE OF THE CASE

1. Plaintiff DNC Parks & Resorts at Yosemite, Inc. ("DNCY") brings this action pursuant to 28 U.S.C. §1491(a)(1) for damages resulting from Defendant's breach of an express contract under which DNCY provides concession services within Yosemite National Park ("Yosemite") and for damages resulting from Defendant's breach of an implied-in-fact contract with DNCY to conduct a fair competition for the new concession contract at Yosemite.

### PARTIES

2. Plaintiff DNCY is a subsidiary of Delaware North Parks & Resorts, Inc., one of the largest hospitality management companies serving national and state parks in the United States. Prior to May 9, 2003, DNCY was named Yosemite Concession Services Corporation.

3. Defendant is the United States of America ("the Government"). The contract at issue was executed by the Director of the National Park Service ("NPS") on behalf of the Secretary of the Department of the Interior ("Secretary").

### JURISDICTION AND VENUE

4. Jurisdiction and venue in this Court are proper under 28 U.S.C. §1491(a)(1).

1

## FACTUAL BACKGROUND

5. On or about September 29, 1993, the Secretary, acting through the Director of NPS, and DNCY entered into Contract No. CC-YOSE004-93 (the "Contract"), a concession contract "to provide accommodations, facilities and services for the public" within Yosemite.

6. Under the Contract, DNCY operates 1,542 guest rooms, 25 food and beverage units, 19 retail locations, a wide range of guest activities including the Wawona golf course, the Badger Pass ski area, horseback riding, and multiple interpretive programs, along with the support services needed to keep these operations running, including office and maintenance staff, warehouses, transportation, and employee housing.

7. The Contract had an initial 15-year term commencing October 1, 1993 that was to expire on September 30, 2008. The term was extended on several occasions and the Contract is currently set to expire on February 29, 2016.

A. **As a condition of being granted the Contract, DNCY purchased all of Curry Company's assets used or held for use in Yosemite.**

8. For more than 100 years prior to 1993, visitor services at Yosemite (both before and after it was designated a U.S. National Park) had been provided by a private company, the Yosemite Park & Curry Company ("Curry Company").

9. Curry Company built significant improvements in Yosemite with its own capital, including The Ahwahnee, Yosemite Lodge, and Curry Village. Curry Company held a "possessory interest" in the structures it built, consisting of all incidents of ownership, except legal title, which was vested in the Government.

10. Curry Company also developed and used registered and unregistered trademarks, servicemarks and logos in its operations, including the iconic Half-Dome logo design, "The Awhanee" hotel name and logo design, "Bracebridge Dinner," and "Go Climb A Rock."

11. Curry Company's final concession contract with NPS provided that at the end of its term, if Curry Company's concession operations were to be thereafter conducted by a successor, it was required sell to the successor its possessory interest in its improvements and "all other property" Curry Company "used or held for use in connection with its Yosemite operations." The contract further provided that the Secretary would require any successor concessioner to purchase Curry Company's possessory interest and "other property," and pay Curry Company "the fair value thereof."

12. As Curry Company's contract approached expiration, Curry Company relinquished all of its possessory interest in concessioner improvements, leaving only its "other property" to be purchased by a successor concessioner.

13. To fulfill the Secretary's obligation to require Curry Company's successor to purchase the "other property," the Statement of Requirements issued by NPS in 1992 for the Contract required, as a condition of the award of the Contract, that the successful bidder acquire Curry Company's remaining assets for a non-negotiable, pre-determined price of approximately $61.5 million (roughly $115 million in 2015 dollars).

14. After being selected for award of the Contract, DNCY met this requirement (by accepting the assignment of a merger agreement between Curry Company and the National Park Foundation) and purchased all of the "other property" Curry Company used or held for use in its operations at Yosemite.

15. Included in the "other property" DNCY was required to purchase from Curry Company were Curry Company's intangible assets such as registered and unregistered trademarks, servicemarks, and logos, and Curry Company's customer mailing list.

**B.     The Contract obligates NPS to require a successor concessioner to purchase all of DNCY's property used or held for use in Yosemite.**

16.     As with Curry Company's contract, DNCY's Contract, which was drafted by NPS, expressly obligates NPS to require any successor concessioner at Yosemite to purchase property from DNCY. The Contract provides:

> (i) [DNCY will] sell and transfer to the successor designated by the Secretary its POSSESSORY INTEREST in CONCESSIONER and GOVERNMENT IMPROVEMENTS, if any, as defined under the contract, and <u>all other property of [DNCY] used or held for use in connection with such operations</u>; and

> (ii) the Secretary will require such successor, as a condition to the granting of a contract to operate, to purchase from [DNCY] such POSSESSORY INTEREST, if any, and <u>such other property</u>, and to pay [DNCY] the fair value thereof.

Contract, Section 13(b)(1) (capitalization in original; underlining added) (the underlined language is hereinafter referred to as the "Other Property").

17.     The Contract requires NPS to make the successor's purchase of and payment for DNCY's Other Property "a condition to the granting of" the next contract to operate concessions in Yosemite.

18.     The Contract also requires NPS to require a successor concessioner "to pay the fair value" of DNCY's Other Property.

19.     DNCY's Other Property includes all of its numerous operational assets, including intangible property. DNCY has maintained the registrations and fully exploited the trademarks, servicemarks and logos NPS required DNCY to purchase from Curry Company. DNCY has also created, used and registered additional marks. Additionally, DNCY has cultivated a customer database with 75 different informational fields for more than 720,000 customers and has developed a portfolio of Yosemite-related internet assets, including 17 domain names, websites, and multiple social media accounts.

C. **NPS issued a Prospectus for a new Yosemite concession contract stating that NPS would require any successor concessioner to purchase DNCY's intangible property.**

20. On July 9, 2014, NPS issued a prospectus (as amended by amendments 1-13 thereto) (the "Prospectus") for Contract No. CC-YOSE004-16, a new concession contract at Yosemite (the "New Contract"), to commence upon the expiration of the Contract.

21. The Prospectus informed the potential offerors that under the Contract any successor concessioner must purchase DNCY's "other property used or held for use in connection with the operation" and stated that this "includes personal property such as furniture, trade fixtures, equipment, and vehicles."

22. Before, during and after the solicitation process, DNCY repeatedly sought assurances from NPS that it would comply with its obligation under the Contract to require a successor concessioner, as a condition to being granted the New Contract, to purchase and pay for DNCY's Other Property at fair value.

23. In an amendment to the Prospectus, NPS made clear that the Other Property a successor concessioner would be required to purchase from DNCY also includes DNCY's intangible property, including its "intellectual property, customer database, and internet related intangibles."

24. The New Contract to be awarded pursuant to the Prospectus requires that the concessioner transfer intellectual property relating to Yosemite to NPS at the expiration or termination of the contract.

25. On June 16, 2015, NPS announced that it had selected Yosemite Hospitality, LLC for award of the new concession contract at Yosemite. Upon information and belief, Yosemite Hospitality, LLC is a wholly-owned subsidiary of Aramark that was created for the sole purpose of performing the New Contract if its offer was selected. In their communications leading up to

this lawsuit, the parties have often referred to Yosemite Hospitality, LLC as "Aramark." To avoid confusion, therefore, Yosemite Hospitality, LLC is referred to hereafter in this Complaint as "Aramark."

**D.   NPS repudiated its contractual obligation to require Aramark to purchase all of DNCY's Other Property.**

26.   NPS granted Aramark the New Contract without requiring Aramark to purchase and pay for all of DNCY's Other Property at fair value. NPS granted Aramark the New Contract despite the absence of any purchase agreement with DNCY to buy the Other Property for fair value. Instead, after selecting Aramark as the successor concessioner, NPS announced unequivocally that it will not comply with its obligation under the Contract to require Aramark, as a condition to the granting of a contract to operate, to purchase and pay fair value for all of DNCY's Other Property.

27.   First, NPS unequivocally declared that it will not require Aramark to purchase a category of DNCY's Other Property that the parties have referred to as "fixed capitalized assets." This category of Other Property consists of capital improvements that DNCY made at its own expense, all of which were pre-approved by NPS.

28.   Second, NPS unequivocally stated that, contrary to the terms of the Prospectus, it will no longer require Aramark to purchase any of DNCY's intangible property.

29.   DNCY is and has been prepared to sell all of its Other Property, including fixed capitalized assets and intangible property, to Aramark for fair value pursuant to the terms of the Contract, just as DNCY was required to buy all of Curry Company's "other property."

30.   DNCY has been and will be damaged by NPS's repudiation of its obligation to require Aramark to purchase all of DNCY's Other Property for fair value, in breach of the Contract. DNCY's damages include the dollar amounts that DNCY would have received from

Aramark in return for the fixed capitalized assets and intangible property had NPS complied with its obligation to require Aramark to purchase that property for fair value as a condition to granting Aramark the successor concession contract at Yosemite. DNCY has also incurred costs that would have been unnecessary in the absence of NPS's breach, such as costs arising from DNCY's efforts to persuade Aramark to purchase and pay fair value for all of DNCY's Other Property.

E.  **DNCY was prejudiced by NPS's retraction of a major Prospectus requirement after NPS had selected Aramark for award.**

31.  DNCY submitted a bid for the New Contract. DNCY incurred substantial costs preparing its bid.

32.  In preparing the bid, DNCY relied upon the Prospectus, including the requirement that a new concessioner purchase DNCY's intangible property. In particular, DNCY recognized that, if another offeror was awarded the New Contract, DNCY was entitled to be paid the fair value of its intangible property. If DNCY was awarded the New Contract, however, DNCY would forego this opportunity to sell its intangible property and would be required to transfer its Yosemite-related intellectual property to NPS for no additional compensation.

33.  DNCY's bid accounted for this opportunity cost by including it as a cost of performing the New Contract. If the Prospectus had not stated that the new concessioner would be required to buy DNCY's intangible property, DNCY would not have included this opportunity cost in its financial analysis and would have submitted a bid that would have been materially more attractive to NPS and could have been selected for award.

## COUNT I

34.  DNCY incorporates by reference paragraphs 1 through 33 above as if fully set forth herein.

35. Defendant's failure to require Aramark to purchase and pay fair value for the property DNCY uses or holds for use in connection with its Yosemite operations, as a condition to granting Aramark the New Contract, is a breach of the Contract.

36. Defendant's unequivocal repudiation of its contractual obligation to require Aramark to purchase and pay for the Other Property as a condition to being granted the New Contract is a breach of the Contract.

37. Defendant's breaches of the Contract have caused DNCY to suffer money damages and will continue to cause additional damages to DNCY, in an amount to be proved at trial.

## COUNT II

38. DNCY incorporates by reference paragraphs 1 through 37 above as if fully set forth herein.

39. By issuing the Prospectus for the New Contract and inducing DNCY to incur substantial costs in the preparation of a conforming bid, NPS formed an implied-in-fact contract with DNCY to conduct a fair and honest competition for the New Contract that was not arbitrary, capricious, an abuse of discretion or in violation of law.

40. The Prospectus was issued under the authority of the regulations set forth at 36 C.F.R. §§ 51.1–51.104, which are incorporated by reference into the Prospectus and control in the event of any inconsistency between the terms of the Prospectus and the regulations. Specifically, 36 C.F.R. § 51.4 requires NPS to award all concession contracts through a public solicitation process, which must describe the terms and conditions of the concession contract in a prospectus. Additionally, 36 C.F.R. § 51.19 requires NPS to award a concession contract that does not materially amend or deviate from the terms of the prospectus.

41. NPS breached its implied-in-fact contract with DNCY by materially deviating from the terms of the Prospectus after selecting Aramark for the award. NPS's actions were arbitrary, capricious, an abuse of discretion and not in accordance with law. Specifically, NPS's post-award announcement that Aramark would not be required to purchase DNCY's intellectual and other intangible property was contrary to the terms of the Prospectus. Offerors such as DNCY could not reasonably anticipate that the requirement to purchase DNCY's intellectual and other intangible property would be eliminated post-award. The New Contract between NPS and Aramark therefore violates 36 C.F.R. §§ 51.4 and 51.19, because its terms are materially different from those of the Prospectus under which the offerors competed.

42. DNCY was prejudiced by NPS's actions. Had the Prospectus accurately stated NPS's intent not to require the new concessioner to buy DNCY's intellectual and other intangible property, the submitted bids would have been materially different and DNCY would have had a substantial chance of receiving the award.

43. NPS's breach of the implied-in-fact contract caused damages to DNCY in the form of bid and proposal costs.

44. DNCY prays for judgment in its favor against the Government for damages in an amount to be determined at trial, together with costs, reasonable attorneys' fees and other relief as the Court deems just.

Dated: September 17, 2015

Respectfully submitted,

/s/ Thomas P. McLish

Thomas P. McLish (Attorney of Record)
tmclish@akingump.com
Joseph W. Whitehead (Of Counsel)
jwhithehead@akingump.com
Karol A. Kepchar (Of Counsel)
kkepchar@akingump.com
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
(202) 887-4324 (Tel)
(202) 887-4288 (Fax)

Jennifer A. Shah (Of Counsel)
jshah@phillipslytle.com
Nicolas J. Rotsko (Of Counsel)
nrotsko@phillipslytle.com
PHILLIPS LYTLE LLP
125 Main Street
Buffalo, NY 14203-2887
(716) 847-5467 (Tel)
(716) 852-6100 (Fax)

Attorneys for DNC Parks & Resorts at Yosemite, Inc.