**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

DNC PARKS & RESORTS AT YOSEMITE,     )
INC.,     )
    )
       Plaintiff,     )
    )
v.     )     No. 15-cv-1034
    )     (Chief Judge Campbell-Smith)
UNITED STATES,     )
    )
       Defendant.     )
    )

## <u>DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT</u>

For its answer to plaintiff's complaint, defendant admits, denies, and alleges as follows:

1.    The allegations in paragraph 1 are plaintiff's characterizations of its case, to which no response is required. To the extent a response is required, defendant denies.

2.    The allegations in paragraph 2 are plaintiff's characterizations regarding itself, to which no response is required.

3.    Admits.

4.    The allegations in paragraph 4 are conclusions of law, to which no response is required.

5.    Admits.

6.    Admits all allegations, with the exception of plaintiff's allegation that plaintiff, DNC Parks & Resorts at Yosemite, Inc. (DNCY), operates 1,542 guest rooms, 25 food and beverage units, and 19 retail locations. Defendant avers that DNCY currently operates 1,564 guest rooms, 27 food and beverage units, and 23 retail locations.

7.    Admits all allegations but avers that the contract was initially extended for three years and then, separately, the operations thereunder continued for approximately five years.

8.     Admits that Yosemite Park & Curry Company (YP&CC) was a company that had provided visitor services at Yosemite prior to 1993. Denies the allegations that YP&CC has been operating in Yosemite for more than 100 years. Defendant further avers that YP&CC was formed in 1925 from the merger of the Curry Company and Yosemite National Park Company, both of which had previously been providing visitor services in Yosemite.

9.     Admits that YP&CC or its predecessor entities built The Ahwahnee, Yosemite Lodge, and Curry Village. The second sentence consists of legal conclusions, to which no response is required.

10.     Admits that YP&CC registered trademarks, servicemarks, and logos in connection with its operations including the Half-Dome logo, "The Ahwahnee" hotel name, and "Bracebridge Dinner." Defendant does not have sufficient information to admit or deny whether YP&CC developed and used unregistered trademarks, servicemarks or logos or whether it registered "The Ahwahnee" logo design. Defendant denies that YP&CC registered "Go Climb A Rock." Defendant further avers that "Go Climb a Rock" was registered by MCA, Inc.

11.     Admits.

12.     Defendant denies that YP&CC relinquished its possessory interest in concessioner improvements during the term of its contract. Defendant avers that YP&CC relinquished its possessory interest when the merger agreement closed. Defendant further avers that plaintiff's concession contract CC-YOSE004-93 (DNCY's Concession Contract) states that

plaintiff waives and relinquishes any possessory interest rights in YP&CC's former possessory interest improvements.

13.     Denies. Defendant further avers that the Statement of Requirements issued by the National Park Service (NPS) in 1992 for CC-YOSE004-93 required that the successful bidder acquire all of YP&CC's stock for a pre-determined price of approximately $61.5 million. Denies that this obligation was linked to the obligations of the Secretary of the Department of the Interior (Secretary) to require YP&CC's successor to purchase YP&CC's "other property." Further, defendant denies plaintiff's allegation that, pursuant to the Statement of Requirements, the successful bidder would be required to purchase YP&CC's "remaining assets." Instead, defendant avers that the Statement of Requirements provided for the sale to the successful bidder of YP&CC's *stock* and not, as a distinct matter, its "remaining assets."

14.     Admits that DNCY accepted assignment of a merger agreement between YP&CC and the National Park Foundation (NPF). Denies that DNCY purchased YP&CC's "other property" outright. Defendant further avers that DNCY purchased YP&CC's stock, not its assets.

15.     The allegations in paragraph 15 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required; to the extent they may be deemed allegations of fact, they are denied. Defendant further avers that DNCY purchased YP&CC's stock, not its assets.

3

16.     Admits that DNCY's Concession Contract obligates the NPS to require a successor concessioner at Yosemite to purchase certain property from DNCY. Admits that Section 13(b)(1) of DNCY's Concession Contract is quoted accurately.

17.     The allegations in paragraph 17 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required. To the extent a response is required, defendant admits that DNCY's Concession Contract requires the NPS to require the successor to purchase DNCY's "other property" as a condition to the granting of the next contract. Defendant denies any implication that the purchase must be completed before the new contract becomes effective. Defendant avers that historically it has been standard practice for an incumbent concessioner and its successor to negotiate and close on the purchase of "other property" after the effective date of the new concession contract.

18.     The allegations in paragraph 18 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required.

19.     The allegations in paragraph 19 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required; to the extent they may be deemed allegations of fact, they are denied.

20.     Admits.

21.     Admits.

4

22.     The allegations in paragraph 22 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required; to the extent they may be deemed allegations of fact, they are denied.

23.     The allegations in paragraph 23 purport to characterize Amendment 12 to the Prospectus, a document that speaks for itself and is the best evidence of its contents. Defendant denies any allegations that are inconsistent with the plain language, meaning, or context of Amendment 12 and the Prospectus.

24.     The allegations in paragraph 24 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required. To the extent a response is required, defendant avers that Exhibit K to concession contract CC-YOSE004-16 (the New Concession Contract) states that, "as a condition of this Contract, Concessioner hereby and unequivocally transfers all rights, title and interest of all Marks acquired from DNC Parks & Resorts at Yosemite, Inc., and any associated goodwill therein, to the National Park Service effective as of the original expiration date or termination of this Contract, whichever is sooner."

25.     Admits as to first and third sentences. Defendant denies the allegations in the second sentence, and avers that Yosemite Hospitality, LLC is a wholly-owned subsidiary of Aramark Sports & Entertainment, LLC. The statement in the fourth sentence does not require a response.

26.     The allegations in paragraph 26 consist of characterizations of plaintiff's case, to which no response is required. To the extent a response is required, defendant denies.

5

27.    Admits that the NPS declared that it will not require Aramark to purchase what DNCY claims as "fixed capitalized assets." Denies that these assets are a category of DNCY's "other property." Defendant does not have sufficient information to admit or deny the allegations in the second sentence. To the extent a response is required, defendant denies. Defendant avers that pre-approval of construction or installation of a project is not a singularly sufficient condition for a project's eligibility for compensation. Defendant also avers that, pursuant to 54 U.S.C. §101915(e), once a capital improvement is constructed or installed by a concessioner on land owned by the United States in a National Park, title is vested in the United States, so the plaintiff has no property to sell with respect to most of its alleged "fixed capitalized assets."

28.    Denies plaintiff's characterization of the nature of NPS's communication. Admits that NPS informed DNCY that NPS would not require the successor concessioner to purchase intangible property developed, owned, or claimed by DNC.

29.    Defendant does not have sufficient information to admit or deny the allegations in paragraph 29. Denies that DNCY purchased YP&CC's "other property" outright. Defendant further avers that DNCY purchased YP&CC's stock, not its assets.

30.    The allegations in paragraph 30 consist of characterizations of plaintiff's case, to which no response is required. To the extent a response is required, defendant denies.

31.    Admits as to the first sentence. Defendant does not have sufficient information to admit or deny the allegations in the second sentence.

6

32.     Defendant does not have sufficient information to admit or deny the allegations in the first and second sentences regarding what DNCY "relied upon" or "recognized" regarding its offer.  The allegations in the third sentence consist of legal conclusions and characterizations of plaintiff's case, to which no response is required.

33.     Defendant does not have sufficient information to admit or deny the allegations in paragraph 33 regarding how DNCY accounted for any "opportunity cost" of performing the contract or how it would have bid in different circumstances.

## COUNT 1

34.     Defendant incorporates paragraphs 1 through 33 by reference.

35.     The allegations in paragraph 35 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required.  To the extent a response is required, defendant denies.

36.     The allegations in paragraph 36 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required.  To the extent a response is required, defendant denies.

37.     The allegations in paragraph 37 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required.  To the extent a response is required, defendant denies.

## COUNT 2

38.     Defendant incorporates paragraphs 1 through 37 by reference.

7

39.    The allegations in paragraph 39 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required.  To the extent a response is required, defendant denies.

40.    The allegations in the first sentence of paragraph 40 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required.  The allegations in the second sentence purport to characterize the regulations at 36 C.F.R. §51.4 and §51.19, documents that speak for themselves and are the best evidence of their content.  Defendant denies any allegations that are inconsistent with the plain language, meaning, or context of 36 C.F.R. §51.4 and §51.19.

41.    The allegations in paragraph 41 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required.  To the extent a response is required, defendant denies.

42.    The allegations in paragraph 42 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required.  To the extent a response is required, defendant denies.

43.    The allegations in paragraph 43 consist of legal conclusions and characterizations of plaintiff's case, to which no response is required.  To the extent a response is required, defendant denies.

8

44.     The allegations in paragraph 44 are a prayer for relief, which requires no answer. To the extent that an answer is required, defendant denies that plaintiff is entitled to the requested relief.

## AFFIRMATIVE DEFENSE:  MOOTNESS:

45.     In Amendment 12 of the Prospectus, NPS indicated that any new concessioner at Yosemite National Park would be required to purchase certain of DNCY's intangible property.  In Amendment 12, NPS estimated a value of $3.5 million for that portion of DNCY's intangible property.

46.     By letter to DNCY dated August 28, 2015, more than two months after NPS's selection of the Yosemite Hospitality, LLC, a subsidiary of Aramark Sports & Entertainment, LLC (hereafter, Aramark) as the new concessioner, NPS stated that it would not require Aramark to purchase any of DNCY's intangible property.

47.     By letter to DNCY served on December 31, 2015, with a copy to Aramark, NPS stated that it was withdrawing its August 28, 2015, letter insofar as the August letter was inconsistent with Amendment 12 to the prospectus.  NPS further informed DNCY and Aramark that DNCY's trademark registrations fall within the category of "other property" that Aramark must purchase at fair value.

48.     Aramark replaces DNCY as the concessioner at Yosemite on March 1, 2016.

49.     DNCY's claims in Count I regarding NPS's failure to require Aramark to purchase and pay fair value for any intangible property identified in Amendment 12 that "DNCY uses or holds for use in connection with its Yosemite operations" are moot.

50.     Similarly, Count II of DNCY's complaint seeking bid and proposal costs based upon DNCY's allegation that "NPS's post-award announcement that Aramark would not be required to purchase DNCY's intellectual and other intangible property was contrary to the terms of the Prospectus" is moot.

## AFFIRMATIVE DEFENSE:  FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

51.    Section 5 of DNCY's Concession Contract requires DNCY to maintain and repair all Government-owned buildings, structures, utility systems, fixtures, equipment and other improvements as well as Concessioner Improvements used by DNCY in its Yosemite concession operations.

52.    Pursuant to Section 5(a)(2) of DNCY's Concession Contract, a comprehensive Maintenance Plan is incorporated into DNCY's Concession Contract.

53.    DNCY's Concession Contract, together with the Maintenance Plan, specifies that maintenance and repairs are part of DNCY's duties under the contract.  DNCY was required to set aside funds in an escrow to assist with funding these duties; in addition, the contract requires that additional Concessioner funds may be necessary to fulfill fully its repair and maintenance obligations.

54.    The Maintenance Plan defines "Repair" as the act of correcting an unsatisfactory physical condition which may include replacement when appropriate.  Examples of DNCY's responsibilities set forth in the Maintenance Plan include:

- interior painting on a five-year schedule or more often as needed (§ V.A.2.)

- the replacement of lighting, heating and cooling systems (§ V.A.3.)

- the replacement of all interior and exterior utility systems within concessioner land assignments (§ V.A.4.)

- the maintenance, repair, and replacement of fixtures attached to the sewage disposal system (including sinks, toilets, urinals and dish-washing equipment) (§ V.H.4.).

55.    Accordingly, pursuant to DNCY's Concession Contract, items such as periodic repainting and carpet replacement properly fall within DNYC's non-compensable repair and maintenance obligations.  Moreover, the contract does not state that the Concessioner has any right to compensation for the cost of fulfilling its repair and maintenance obligations.

56.    DNCY claims, based on the conclusions of its appraisal company, American Appraisal Associates, Inc. (AAA), that DNCY's "other property" that must be transferred under the contract includes the capitalized value of maintenance and improvements made by DNCY to Government-owned buildings and land assignments, which it values at $14,266,820.  DNCY has also adopted AAA's determination that the value of certain "construction in progress" is $755,355.  Instead of recognizing this improvement and construction work as falling under

11

DNCY's non-compensable maintenance and repair obligations, DNCY characterized the capitalized value of these categories of work as a property interest, and gave them the novel label "fixed capital assets."

57.     In a letter dated November 11, 2014, DNCY listed examples of "fixed capital assets" including bathroom renovation, public restrooms renovation, and the Ahwahnee corridor and guest room carpet replacement.  The itemized list of "fixed capital assets" contained in the AAA report further included the cost of repainting walls; the cost of replacing carpet, flooring, and plumbing and lighting fixtures; rodent abatement labor; as well as materials such as wallpaper, carpeting and linoleum.

58.     Pursuant to 54 U.S.C. §101915(e), once a capital improvement is constructed or installed by a concessioner on land owned by the United States in a National Park, title is vested in the United States. Accordingly, upon installation, the plaintiff no longer owns such property so it cannot purport to sell it to a successor concessioner.  Thus, DNCY's claims for installed fixtures, carpeting, paint and the like are prohibited by law because those assets are owned by the United States.

59.     Although the vast majority of these "fixed capital assets" that DNCY demands that the NPS require the new concessioner buy are actually composed of non-compensable repair and maintenance costs, some items may more properly be categorized as:  (1) items for which DNCY might have been entitled to compensation as Possessory Interest but for which it failed to follow the requisite procedures in the Concession Contract for obtaining NPS pre-approval of the

expense; or (2) items of personal property for which defendant acknowledges DNCY is already entitled to compensation under a separate part of Section 13 of DNCY's Concession Contract.

60.    DNCY's category of "fixed capital assets" is not a category of compensable interest recognized in the contract.  Even if installed assets were not clearly designated in the concessions statute as property of the government, the contract spells out the possible categories, both compensable and non-compensable, under which property and labor claims can fall. Merely characterizing the capitalized value of required, non-compensable maintenance and repair work as a new category of "fixed capital assets," does not transmute this obligation into a property interest that the new concessioner must purchase as part of DNCY's "other property."

61.    Finally, defendant is unaware of any previous claim for such "fixed capital assets" from any concessioner in the history of the NPS concessions program, including contracts where DNCY affiliates were either the successor or the incumbent concessioner.  Accordingly, pursuant to DNCY's Concession Contract, DNCY is not entitled to compensation for its novel category of "fixed capital assets."

## AFFIRMATIVE DEFENSE: PRIOR MATERIAL BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

62.    Concession contracts at National Parks can be lucrative because concessioners operate on Federal land, in unique geographical areas, and in a monopoly-like setting within the National Parks themselves.

13

63.     Furthermore, because the improvements within the parks, including hotels, restaurants, and recreational infrastructure, are owned by the United States, concessioners are spared the property taxes that would result from owning such properties.

64.     Moreover, because concession operations are located within unique and often spectacular National Park settings that attract large numbers of visitors to the area, concessioners do not have to spend as much money on marketing as they otherwise might have to.

65.     At Yosemite, all of the hotels, restaurants and recreational infrastructure are owned by the United States.  Thus, DNCY did not own, and has never owned, any of the hotels, restaurants or recreational infrastructure located within Yosemite.  Nor has DNCY ever had a "possessory interest" in any of the hotels, restaurants or recreational infrastructure located within Yosemite.

66.     DNCY and Aramark are two of only a small handful of companies that compete for the large, long-term NPS concession contracts.

67.     Because its concession contract at Yosemite has been so lucrative, DNCY had a strong desire to win the new Yosemite concession contract.

*     *     *     *     *

68.     In 2002, without providing notice to NPS of its intent to do so, DNCY filed applications with the United States Patent and Trademark Office (USPTO) to register several trademarks associated with Yosemite.  These included applications to register the trademarks for the phrase "Yosemite National Park," and on the names of iconic hotels and recreation areas

14

owned by the United States, including "The Ahwahnee," "Wawona," "Yosemite Lodge," "Badger Pass," and "Curry Village."

69.    The USPTO initially rejected DNCY's application to register a trademark for "Yosemite National Park," in part because the trademark would have presented a false association between DNCY and the NPS. The USPTO initially concluded that "the fame of the National Park Service is of such a nature that when [DNCY] uses [Yosemite National Park] for its goods," the public presumes "a connection with the National Park Service."

70.    DNCY responded to that rejection by arguing to the USPTO that its association with NPS was not false, and as proof of that, DNCY submitted a few initial pages of DNCY's Concession Contract, identifying the parties to the contract, while redacting the text under the "Term of the Contract" section of the contract. At that time, DNCY's contract term was only expected to last until 2008.

71.    On September 30, 2015, after receiving notice that it had not been selected for the new Yosemite concession contract and after filing its lawsuit in this matter, DNCY filed an application with the USPTO to register a YOSEMITE design mark, claiming that the services provided in connection with that mark are providing recreational activities and facilities in a national park.

72.    DNCY's parent company has apparently embarked on a business model whereby it collects trademarks to the names of iconic property owned by the United States. Thus, for

15

example, DNC, which has a concession at the Kennedy Space Center, has a trademark
application for the words "Space Shuttle Atlantis."

*   *   *   *   *

73.     DNCY's Concession Contract was originally for fifteen years, and therefore was
set to expire in 2008.  By a contract amendment in 2003, the term was extended for three years,
so that that its contract was then expected to expire in 2011.

74.     In 2010, approximately a year before its contract was expected to expire, DNCY
retained CONSOR Intellectual Asset Management (CONSOR) to provide DNCY with a
valuation of DNCY's intellectual property at Yosemite.  As discussed further below in averments
81-87, DNCY did not inform NPS of the existence of this appraisal until July 2014.

75.     Operations under DNCY's Concession Contract were eventually lengthened by
another five years, through February 29, 2016.

*   *   *   *   *

76.     Paragraph 13(b)(1)(i) of DNCY's Concession Contract requires DNCY, in the
event that its contract expires, to "sell and transfer to the successor designated by the Secretary
its POSSESSORY INTEREST in CONCESSIONER and GOVERNMENT IMPROVEMENTS,
if any, as defined under this contract, and all other property of the Concessioner used or held for
use in connection with such operations."

77.     Correspondingly, Paragraph 13(b)(1)(ii) states that "the Secretary will require
such successor, as a condition to the granting of a contract to operate, to purchase from the

16

Concessioner such POSSESSORY INTEREST, if any, and such other property, and to pay the Concessioner the fair value thereof."

78.     Given that the Secretary must require a successor concessioner to purchase at fair value DNCY's property "used or held for use in connection with" DNCY's operations at Yosemite, DNCY was obligated to adhere to the requirements of good faith and fair dealing in setting forth its identification of "other property" and estimation of the fair value of its property to be purchased by its successor.

79.     DNCY did not reveal the existence, much less the value, of its intellectual property, "fixed capital assets" and other intangibles on its Annual Financial Report filings, even after it obtained its appraisals in 2010.

80.     Moreover, despite email requests from the National Park Service in December 2011 for property lists in connection with development of the Prospectus, DNCY failed to reveal the existence or the amount of its claims until May 30, 2014 at the earliest.

81.     On May 30, 2014, DNCY wrote NPS, noting that DNCY was "aware that the NPS is in the process of preparing a request for proposal (RFP) for the primary concession contract in Yosemite." DNCY then stated that:

> In anticipation of a potential RFP process, we have undertaken a valuation of the property that we use for our operations in the Park and believe the total value of such property will be approximately $100,000,000 as of the end of our contract. . . . We are writing this letter now because we wanted to make sure that NPS is aware of this valuation so that NPS can ensure that potential bidders are properly informed in order to avoid a potential contractual dispute depending on the bidder selected.

17

82.     On June 5, 2014, DNCY responded to NPS's request for more information by providing a table showing five asset categories and summary valuations for each category of asset.  Among the valuations were $14,700,000 for "Other Assets" and $51,200,000 for "Intellectual Property."

83.     Later on that same day – June 5, 2014 – NPS  sent an email to DNCY requesting an itemized list for each category of assets referenced in DNCY's letter, "with the exception of the computers" (for which DNCY had claimed $700,000).

84.     By letter dated June 16, 2014, DNCY provided NPS a "schedule of asset values with a breakdown of asset categories."  In a manner similar to DNCY's June 5, 2014, letter, the schedule included summary valuations of $14,788,156 for "Other Assets" and $51,160,136 for "Intellectual Property – Trademarks, service marks, customer database and internet related intangibles" without any explanation or documentary support, while stating that "the fair value we have determined is an appropriate assessment of the amount that a successor concessioner would be required to pay us for the identified assets in the event that we are not the successful bidder."

85.     On July 3, 2014, the NPS regional director wrote to DNCY requesting more information about the categories of "Other Assets" and "Intellectual Property – Trademarks, service marks, customer database and internet related intangible assets" – provided by DNCY in its June 16 letter.  The regional director noted that DNCY had not previously referred to those asset categories or provided NPS with a description of them.

18

86.     On July 9, 2014, NPS issued the Prospectus seeking bids for the new Yosemite concession contract.

87.     In a letter dated July 18, 2014 – one week after NPS issued the Prospectus – DNCY for the first time informed NPS that it (DNCY) had obtained a valuation or appraisal of its claimed intellectual property assets from CONSOR in 2010.  DNCY provided NPS with a copy of CONSOR's report dated July 18, 2014, but the report lacked data supporting its conclusions.

88.     On November 20, 2014, NPS issued Amendment 9 to the Prospectus.  In that Amendment, the NPS stated that:

> Approximately a month before the Prospectus was to be published, the Service received notice from the Existing Concessioner that it believed the total value of its claim for "Other Property" totaled $100,000,000.  It supplied no details at that time.  On request by the Service, a week later the Existing Concessioner sent a letter breaking its claim into five general categories, including unspecified claims for over $51,000,000 in intellectual property ... and nearly $15,000,000, in unidentified 'Other Assets.'  When asked for more detail, on June 16, 2014 the Existing Concessioner sent another letter merely breaking its claim into nine categories but providing little substance. . . .  On November 14, 2014, the Service received further information from the Existing Concessioner asserting that it does not claim possessory interest for this category of 'improvements made to government buildings,' yet it asserts that it is entitled to compensation for these sorts of real property improvements as capitalized fixed assets (such as carpet replacement and bathroom upgrades).  Based on the minimal information provided, the Service considers these items to be part of the concessioner's maintenance obligation.  In sum, the Service is unable at this time to determine the credibility of *approximately $65,000,000* of the Existing Concessioner's recently-asserted claims.  (Emphasis added).

19

89.     On December 1, 2014, DNC mailed NPS a complete copy of the CONSOR

Report. DNCY relied on this CONSOR Report in asserting that the fair value of its intellectual

property and at least some of its intangible property is $51 million. To our knowledge, to date,

DNCY has refused to provide the CONSOR Report to Aramark. The CONSOR Report valued

DNCY's trademarks and servicemarks at $35.5 million, and it added another $8.5 million in a

so-called "brand extension value" of the trademarks and servicemarks. Thus, the CONSOR

Report valued DNCY's trademarks and servicemarks, including their brand extension value, at

$44 million. The remaining $7 million of the overall $51 million in intangible property was

composed of customer database intangible assets and internet-related intangible assets.

90.     NPS obtained a valuation report prepared by third party expert consultants

Dornbusch and Associates who analyzed CONSOR's valuation of DNCY's intangible

intellectual property. Following its receipt of the Dornbusch report, NPS valued DNCY's

intellectual property and intangibles at $3.5 million. The $3.5 million was composed of a value

of $1.63 million for DNCY's Yosemite-related trademarks, $620,000 for DNCY's internet-

related intangibles, and $1.23 million for DNCY's customer database. Thus, DNCY's value of

its trademarks and servicemarks, at $44 million, is *27 times* the amount of the $1.63 million

value estimated by NPS.

91.     The CONSOR Report is fundamentally flawed and grossly inaccurate because it

sets forth a valuation methodology that ignores the unique paradigm of a concession within a

National Park: namely, that the underlying properties are owned by the United States in a

National Park where it is the unique, natural surroundings that draw visitors to the parks – and to the concessions – and not the strength of a particular hotel's or restaurant's "trade" name. Furthermore, to the degree that there is good will or trade facilitation present with respect to the name of a particular Government-owned property, that goodwill or trade facilitation is primarily the result of the properties themselves and their location within the National Park, both of which are owned by the United States.

92.     Furthermore, the CONSOR Report sets forth a claim for $8 million in a "brand extension" trademark value which purports to set a value of the various trademarks "beyond the borders of the operations of Yosemite National Park itself." But Section 13(b)(1)(i) of DCNY's Concession Contract only provides that DNCY be compensated for the property "used or held for use in connection with such operations," meaning DNCY's operations *within Yosemite National Park*. Moreover, to our knowledge, DNCY itself never licensed any other entity to use any of its registered marks. Therefore, any value attributable to "brand extension" is by definition not compensable as "other property" under the terms of the contract.

93.     On December 22, 2014, NPS issued Amendment 12 to the Prospectus. In that Amendment the NPS stated that:

> The Service estimates the value of other property the Concessioner must purchase from the Existing Concessioner (but not including inventory) at approximately $30,600,000 in 2016 dollars. This total includes: personal property such as furniture, trade fixtures, equipment, and vehicles; intangible property such as trademarks as discussed in previous solicitation amendments, the Existing Concessioner's customer database, and internet related intangibles.

... This is only an estimate, and the final determined value could differ from this estimate[.] (Emphasis in original).

94.    Amendment 12 to the Prospectus also stated that:

The following exhibit summarizes the estimated initial investment to be made by the Concessioner in 2016 dollars, which is projected to be $40,100,000, consisting of the purchase of the Existing Concessioner's personal property, inventory, supplies, start-up costs . . . and working capital. . . . "Other Property (other than Inventory)" includes $3.5 million for the Existing Concessioner's intangible property [.]"

95.    On January 5, 2015, DNCY filed a protest with the General Accountability Office (GAO) seeking to terminate the Prospectus for the new Yosemite concession contract because DNCY disputed the NPS's $3.5 million valuation of DNCY's intangible assets, and that dispute allegedly created, in relation to DNCY's estimate of $51 million, a "material uncertainty prohibiting a reasonable comparative evaluation of proposals."

96.    On April 14, 2015, the GAO dismissed DNCY's bid protest.

97.    On June 16, 2015, NPS selected Aramark as the winning bidder for the new Yosemite concession contract. NPS had obtained bids for the new Yosemite contract from only two companies: DNCY and Aramark.

98.    Following NPS's selection of Aramark as the winning bidder, DNCY has repeatedly requested that NPS demand that Aramark pay DNCY for its intangible property, which DNCY has continued to value at $51 million.

99.    On July 13, 2015, DNCY wrote to NPS stating that it would not negotiate with Aramark over the fair value of the intangible property.

22

100.    On July 27, 2015, DNCY wrote NPS stating, among other things, that it would be "premature" to provide the CONSOR Report to Aramark.

101.    Following NPS's selection of Aramark as the winning bidder, DNC has also repeatedly requested that NPS require Aramark to pay $14.7 million for tangible "other property," which has included DNCY's request for payment of alleged "fixed capital assets."

*     *     *     *     *

102.    The United States incorporates by reference paragraphs 51 through 61 above, setting forth the United States' affirmative defense relating to DNCY's demand that NPS require the new concessioner pay for DNCY's "fixed capital assets," which are largely maintenance, repair, and other expenses which are not compensable under DNCY's Concession Contract (with a few items that qualify as compensable personal property).

103.    By setting forth an improper and wildly inflated valuation of "other property," including tangible property, for which DNCY requests payment pursuant to Section 13 of DNCY's Concession Contract, and then ultimately requesting payment for items for which it is not entitled to receive compensation, DNCY has breached its duty of good faith and fair dealing with respect to Section 13 of DNCY's Concession Contract.

104.    By setting forth a grossly exaggerated and improper fair value of $51 million for its intellectual property, attempting, at the GAO, to stop the solicitation based upon its $51 valuation of the trademarks (relative to NPS's $3.5 million valuation), and then ultimately requesting payment of $51 million for its trademarks and certain intangibles, DNCY has

23

breached its duty of good faith and fair dealing with respect to Section 13 of DNCY's Concession Contract.

105.    The requirement under DNCY's Concession Contract that DNCY be paid fair value for its "other property" is a material term of the contract.

106.    DNCY's breach of the duty of good faith and fair dealing with respect to Section 13 of DNCY's Concession Contract is a prior material breach of that contract. As a result, NPS is excused from performance under Section 13(b)(ii) of the contract.


WHEREFORE, defendant requests that the Court enter judgment in its favor, order that the complaint be dismissed, and grant defendant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General


ROBERT E. KIRSCHMAN, JR.
Director

/s/ Bryant G. Snee
BRYANT G. SNEE
Deputy Director

Of Counsel:
SCOTT BOLDEN
Department of Justice

Dated:  January 4, 2016

/s/ John H. Roberson
JOHN H. ROBERSON
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 353-7972
Fax: (202) 514-8640
email:  John.Roberson@usdoj.gov

25