## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| DNC PARKS & RESORTS AT YOSEMITE, INC., | ) |
| Plaintiff, | ) |
| v. | ) No. 15-1034C |
| THE UNITED STATES OF AMERICA, | ) Hon. Patricia E. Campbell-Smith, C.J. |
| Defendant. | ) |

## FIRST AMENDED COMPLAINT

1.      Plaintiff DNC Parks & Resorts at Yosemite, Inc. ("DNCY") brings this action pursuant to 28 U.S.C. §1491(a)(1) for damages resulting from Defendant's breach of Concession Contract No. YOSE004-93 (the "Contract"), under which DNCY provides concession services in Yosemite National Park ("Yosemite") and for damages resulting from Defendant's breach of an implied-in-fact contract with DNCY to conduct a fair competition for the new concession contract at Yosemite.

2.      NPS has breached the Contract by failing to comply with its contractual obligation to require the successor concessioner to purchase tangible and intangible property that DNCY uses in its operations at Yosemite.  NPS has also violated its implied contractual duty to act in good faith toward DNCY by failing to cooperate with DNCY and instead actively working to defeat DNCY's ability to obtain the compensation it is due under the Contract.  In addition, by failing to require the successor concessioner to purchase all of DNCY's Yosemite property as it said it would in the prospectus for the new Yosemite concession contract, NPS breached its implied-in-fact contract with DNCY to hold a fair competition for the new contract.  NPS's breaches of its contractual duties have caused money damages to DNCY.

1

## PARTIES

3.      Plaintiff DNCY is a subsidiary of Delaware North Parks & Resorts, Inc., which serves national and state parks in the United States.  Prior to May 9, 2003, DNCY was named Yosemite Concession Services Corporation.

4.      Defendant is the United States of America (the "Government").  The contract at issue was executed by the Director of the National Park Service ("NPS") on behalf of the Secretary of the Department of the Interior ("Secretary").

## JURISDICTION AND VENUE

5.      Jurisdiction and venue in this Court are proper under 28 U.S.C. §1491(a)(1).

## FACTUAL BACKGROUND

**I.      DNCY's Existing Concession Contract at Yosemite**

6.      On or about September 29, 1993, the Secretary, acting through the Director of NPS, and DNCY entered into the Contract "to provide accommodations, facilities and services for the public" within Yosemite.

7.      NPS drafted the Contract.

8.      Under the Contract, DNCY operates 1,542 guest rooms, 28 food and beverage units, 19 retail locations, a wide range of guest activities including the Wawona golf course, the Badger Pass ski area, horseback riding, and multiple interpretive programs, along with the support services needed to keep these operations running, including office and maintenance staff, warehouses, transportation, and employee housing.

9.      The Contract had an initial 15-year term commencing October 1, 1993 that was to expire on September 30, 2008.  The term was extended, then continued on several occasions and the Contract is currently set to expire on February 29, 2016.

**A.     As a condition to the Contract, DNCY purchased all of its predecessor's assets used or held for use in Yosemite.**

10.     Since the late 1800s, visitor services at Yosemite have been provided by private companies, including the Yosemite Park & Curry Company and its predecessors in interest ("Curry Company").

11.     Curry Company was acquired by MCA, Inc. in 1973, which in turn was acquired in 1991 by Matsushita Co.  Soon after Matsushita Co.'s acquisition of MCA, Secretary of the Interior Manuel Lujan caused Matsushita through its subsidiary, MCA, to put the stock of Curry Company in escrow under the control of the National Park Foundation to hold temporarily while NPS solicited bids and selected a new Yosemite concessioner.

12.     Curry Company built significant improvements in Yosemite with its own capital, including The Ahwahnee hotel, Yosemite Lodge and Curry Village.  Curry Company held a "possessory interest" in the structures it built, consisting of all incidents of ownership, except legal title, which was vested in the Government.

13.     Curry Company also developed and used both registered and common law trademarks, service marks and logos in its operations, including the iconic Half-Dome logo design, "The Ahwahnee" hotel name, The Ahwahnee logo design (USPTO Reg. No. 1,534,825), "Bracebridge Dinner," and "Go Climb A Rock."

14.     Curry Company's final concession contract with NPS provided that at the end of its term, if Curry Company's concession operations were to be thereafter conducted by a successor, Curry Company would be required to sell to the successor its possessory interest in its improvements and "all other property" Curry Company "used or held for use in connection with its Yosemite operations."  The contract further provided that the Secretary would require any

successor concessioner to purchase Curry Company's possessory interest and "other property" and pay Curry Company "the fair value thereof."

15.     Curry Company, however, relinquished to the NPS for no additional consideration all of its possessory interest in concession facilities prior to the expiration of its contract, leaving only its "other property" to be purchased by a successor concessioner.

16.     To fulfill the Secretary's obligation to require Curry Company's successor to purchase the "other property" for "the fair value thereof," the Statement of Requirements issued by NPS in 1992 for the Contract required, as a condition to the award of the Contract, that the successful bidder acquire Curry Company's remaining assets for a non-negotiable, pre-determined price of approximately $61.5 million (roughly $115 million in 2015 dollars), and assume approximately $30 million in pension liabilities and un-quantified environmental clean up liability.

17.     DNCY was the only qualified bidder.

18.     After being selected for award of the Contract, DNCY met this requirement by accepting the assignment of a merger agreement between Curry Company and the National Park Foundation.  In this transaction, DNCY acquired all of Curry Company's stock for $61.5 million. By purchasing 100 percent of Curry Company's stock, DNCY acquired all of Curry Company's assets and liabilities.

19.     This transaction accomplished DNCY's required purchase of all of the "other property" Curry Company used or held for use in its operations at Yosemite.

20.     Included in the "other property" DNCY was required to and did purchase from Curry Company were Curry Company's intangible assets such as its customer mailing list,

registered and common law trademarks, service marks, and logos, including The Ahwahnee,

Curry Village, Wawona, and Badger Pass.

      **B.**      **The Contract obligates NPS to require the next concessioner to purchase all of DNCY's property used or held for use in Yosemite.**

      21.      As with Curry Company's contract, DNCY's Contract expressly obligates NPS to

require the next concessioner at Yosemite to purchase property from DNCY.

      22.      The Contract provides:

> (i) [DNCY will] sell and transfer to the successor designated by the Secretary its POSSESSORY INTEREST in CONCESSIONER and GOVERNMENT IMPROVEMENTS, if any, as defined under the contract, and <u>all other property of [DNCY] used or held for use in connection with such operations</u>; and

> (ii) the Secretary will require such successor, as a condition to the granting of a contract to operate, to purchase from [DNCY] such POSSESSORY INTEREST, if any, and <u>such other property</u>, and to pay [DNCY] the fair value thereof.

Contract, Section 13(b)(1) (capitalization in original; underlining added) (the underlined

language is hereinafter referred to as the "Other Property").

      23.      The Contract thus requires NPS to make the successor's purchase of and payment

for DNCY's Possessory Interest and Other Property "a condition to the granting of" the next

contract to operate concessions in Yosemite.

      24.      The Contract also requires NPS to require the next concessioner "to pay the fair

value" of DNCY's Possessory Interest and Other Property.

      **C.**      **Other Property includes all of DNCY's intangible property.**

      25.      DNCY's Other Property includes all of its numerous operational assets, including

intangible property, such as trademarks, as well as maintenance records for company and

government owned assets, internet domain names, mailing lists, photo inventories used in

marketing and numerous other assets.

26.     DNCY obtained federal and/or state registrations and continuously used the trademarks, service marks and logos NPS required DNCY to purchase from Curry Company. DNCY has also created, used and registered additional marks.

27.     The Contract does not limit in any way DNCY's rights to own, maintain, create, use and register trademarks, service marks and logos related to its operations in Yosemite.

28.     The Contract also does not require DNCY to seek or obtain NPS's consent or approval before owning, maintaining, creating, using and registering such trademarks, service marks and logos.

29.     Over the life of the Contract, NPS has had actual or constructive knowledge of, and has never objected to, DNCY's ownership, maintenance, creation, use and registration of its Yosemite-related trademarks.

30.      Numerous applications for Yosemite-related trademarks were filed in the U.S. Patent and Trademark Office ("PTO") by DNCY and its predecessors in interest.  There was and is a public record of each of those applications and resulting registrations.  Each such application was published for opposition by third parties; however, NPS brought no opposition.  The PTO granted all of DNCY's applications.

31.     Trademarks are a type of intellectual property used by persons in providing products or services to communicate the source of those products or services and distinguish those products and services from those provided by others.  The value of trademarks increases as the marks gain recognition and generate positive associations, i.e. goodwill, among consumers and potential consumers.

32.     A concession, by definition, gives a concessioner the right to sell its products or services on land or in buildings owned by another, such as a restaurant in an airport, the food

service at a university or hotel services in a public park.  Concessioners that bring or develop trademarks used in a concession operation do not forfeit or lose the rights to those trademarks simply because their operations are on land owned by another.  The Contract gave DNCY the right to sell its own products and services in Yosemite, and the Contract contained no restrictions or requirements as to the trademarks under which DNCY would do so.

33.     DNCY's Yosemite-related trademarks are extremely valuable and enjoy extraordinary goodwill.  Such goodwill is not diminished by the fact that it was generated through DNCY's and its predecessor's stewardship of the public properties and locations at Yosemite over many decades.  Likewise, the public's affection for Yosemite itself or the buildings in Yosemite is distinct from the trademark goodwill generated by DNCY by providing quality services under its marks.  For example, the Ahwahnee and Wawona marks are extremely valuable because they are associated with consistently high-quality hotel and resort experiences and services provided by DNCY and as a result have gained widespread, nationwide recognition therefor.  Had DNCY not provided the quality services it did, the value of the trademarks would have suffered.  Moreover, DNCY protected these trademarks for itself and for the next concessioner—who is required to purchase the intellectual property—by obtaining federal registration.

34.     The appraised value of the intellectual property portfolio DNCY uses in its operations at Yosemite is no less than $44 million.

35.     DNCY has also cultivated and significantly grown a customer database, which now contains 75 different informational fields for more than 720,000 customers.  DNCY also developed a portfolio of Yosemite-related internet assets, including 17 domain names, websites, and multiple social media accounts.

**D.    The Contract requires that DNCY be compensated for non-routine capital improvements made with its own funds.**

36.    During the Contract, DNCY used its own funds to make certain capital improvements at Yosemite.  DNCY is entitled to compensation under the Contract for the fair value of these improvements, as either Other Property or assets in which DNCY holds a Possessory Interest.  The appraised value of these improvements is no less than $14.2 million.

37.    The Contract is governed by the National Park Service Concessions Policy Act of 1965, Public Law 89-249 ("1965 Act"), which gives a concessioner such as DNCY an automatic Possessory Interest when it "constructs, pursuant to a contract and with approval of the Secretary, any structure, fixture or improvement upon land owned by the United States within an area administered by the [NPS]."  1965 Act, Section 6.

38.    Possessory Interest is defined in the 1965 Act as "all incidents of ownership except legal title."

39.    The Contract provides that DNCY "shall have Possessory Interest in all capital improvements (as defined below) it makes to government improvements during the term of this contract . . . ."  Contract, Section 4(b)(3) (capitalization removed).  "Capital improvement," in turn, is defined as "major repairs and/or improvements that serve to prolong the life of the government improvement to an extent requiring capital investment for major repair . . . ."  Contract, Section 4(e) (capitalization removed).

40.    Under the Contract, DNCY's entitlement to Possessory Interest has two exceptions.

41.    First, DNCY is not entitled to Possessory Interest for capital improvements paid for with funds from the Capital Improvement Fund ("CIF") or the Government Improvement Account ("GIA").  Contract, Section 4(b)(3).  The CIF and GIA accounts were included in the

Contract to pay for significant, non-routine capital improvements needed at concession facilities in Yosemite.  CIF and GIA funds are not allowed to be used for "routine maintenance," so projects that are "CIF-eligible" cannot be "routine maintenance."  Contract, Section 10(a)(2) & (b)(2).

42.     Second, DNCY is not entitled to Possessory Interest for capital improvements undertaken to fulfill "routine maintenance."  Contract, Section 4(f).

43.     The Contract's Maintenance Plan confirms that DNCY is entitled to Possessory Interest for capital improvements undertaken to fulfill the Contract's Maintenance Plan obligations (other than "routine maintenance" or CIF/GIA funded projects).  Contract, Exhibit I, Section V(A).

44.     Under the Contract, although improvements for routine maintenance or those made with CIF or GIA funds are not compensable, all other approved capital improvements are compensable as either Other Property or Possessory Interest, including those undertaken to fulfill the Maintenance Plan.

45.     If CIF funds were unavailable to pay for "CIF-eligible" non-routine capital improvements needed in Yosemite, the Contract required DNCY to pay for them.

46.     In 1993, NPS confirmed to the House of Representatives Subcommittee on National Parks, Forests and Public Lands that under the Contract DNCY would be compensated for capital improvements paid for with its own funds when CIF funds were unavailable.

47.     During the term of the Contract, many non-routine capital improvements were needed in Yosemite that were "CIF-eligible" but for which CIF funds were unavailable.  DNCY completed "CIF-eligible" capital improvements using its own funds.

48.     DNCY obtained all required NPS approvals for such capital improvements.

49.     DNCY recorded these capital improvements as "depreciable fixed assets" on its Annual Financial Reports ("AFR") that it filed with NPS.  The AFRs contained a Schedule D, which asked DNCY to annually account for its "depreciable fixed assets."

50.     For accounting purposes, "depreciable fixed assets" encompasses the narrower subset "fixed capitalized assets," which is the name DNCY used in discussions with NPS to distinguish its compensable capital improvements from non-compensable improvements (e.g. routine maintenance).

51.     In the accounting notes on "depreciable fixed assets" in its AFRs, DNCY explained that capital improvements were "capitalized" over the expected life of the asset, in contrast to routine maintenance expenditures, which were expensed in the year they were incurred.  These capital improvements extended the useful life of the assets and therefore the spending was "capitalized" as required by GAAP accounting.  DNCY also noted that the "depreciable fixed assets" included items for which it would seek compensation under the Contract.

52.     The "depreciable fixed assets" for which DNCY seeks compensation under the Contract are those non-routine capital improvements that are "capitalized," in contrast to routine maintenance improvements that are expensed.

53.     All of the capital improvements for which DNCY seeks compensation under the Contract were approved by NPS, were made with DNCY's own funds, not CIF or GIA funds, and were not routine maintenance because they were "CIF eligible," and CIF projects exclude routine maintenance.  They were also "used or held for use in connection" with DNCY's operations.

54.     DNCY is entitled to compensation under the Contract for the "depreciable fixed assets" that were non-routine capital improvements and "capitalized" instead of expensed, because they are either Other Property or assets in which DNCY holds Possessory Interest under the Contract.

55.     As such, NPS must require Aramark to purchase them in accordance with the Contract.

## II.     The Prospectus for the new Yosemite Contract.

56.     The Contract is set to expire on February 29, 2016.

57.     Nearly two years before that date, on May 30, 2014, DNCY informed NPS in writing that the appraised fair value of all categories of its Other Property—as determined by an independent appraisal—was $98.6 million.

58.     On June 2, 2014, NPS requested additional information to support this valuation. Over the course of the month, NPS and DNCY continued to correspond regarding the valuation.

59.     On July 3, 2014, NPS requested "documentation identifying with specificity all items of property" related to the Contract.  NPS did not identify any concerns with the extensive information about the assets that DNCY had previously provided.

60.     Before DNCY could respond to this request, on July 9, 2014, NPS issued the prospectus (as amended by amendments 1-13 thereto) (the "Prospectus") for Contract No. CC-YOSE004-16, a new concession contract at Yosemite (the "New Contract").

61.     The Prospectus significantly reduced the scope of visitor services that would be allowed under the New Contract.  DNCY estimates this would result in an annual revenue reduction of more than $10 million for the next concessioner compared to DNCY's historical performance.  The reductions include, but are not limited to, the elimination of horseback rides in

Yosemite Valley and Tuolumne Meadows; gas station operations in Tuolumne Meadows; numerous retail operations in Tuolumne Meadows, Yosemite Village and Yosemite Lodge; a food outlet at Yosemite Lodge; shuttle bus operations in Tuolumne Meadows and between Yosemite Valley and Badger Pass; and a significant reduction in the number of rafts that will be available for daily use in Yosemite Valley.  The Prospectus also eliminated opportunities for the next concessioner to recover the full cost of certain expenses such as utilities, reduced the cost recovery opportunity for operation of the Valley Transportation System, and eliminated the ability to recoup any costs associated with the company's employee housing requirements, further reducing the profitability of the New Contract by millions of dollars.

62.     On information and belief, NPS was concerned that these reductions would result in fewer and less favorable offers for the New Contract, particularly if the next concessioner were required to make a large initial investment to commence performance.

63.     The Prospectus informed the potential offerors that under the Contract the next concessioner must purchase DNCY's "other property used or held for use in connection with the operation" and stated that this "includes personal property such as furniture, trade fixtures, equipment, and vehicles."

64.     The Prospectus contained an incomplete list of DNCY's Other Property.  The Prospectus inaccurately represented that the list was provided by DNCY.

65.     The Prospectus estimated that DNCY's Other Property was worth $22.5 million. The initial Prospectus did not reveal to offerors, however, that DNCY had informed NPS that the appraised value of the Other Property from independent appraisers was $98.6 million.

66.     NPS has an economic incentive to have the new concessioner pay as little as possible for DNCY's property.  The less the new concessioner is required to pay DNCY, the more the new concessioner could offer to NPS in franchise fees to operate in Yosemite.

67.     On information and belief, NPS adopted a strategy designed to minimize the amount the new concessioner would have to pay DNCY at the commencement of the New Contract, and took active steps in furtherance of that strategy.  Among other things, NPS's strategy included insisting that certain forms of property that DNCY uses in its Yosemite operations, including intellectual property and capital improvements, are not compensable under the Contract.  The strategy also included taking steps to increase the negotiating leverage that NPS and the new concessioner would have in future negotiations with DNCY over the fair value of the Other Property, and to increase pressure on DNCY to relinquish its property for less than its fair value.

68.     In furtherance of its strategy, NPS refused to cooperate with DNCY in arriving at a mutually agreeable "fair value" for the Other Property, in the hope of forcing DNCY into a direct negotiation with the new concessioner.  NPS also worked hand-in-hand with its selected new concessioner (Aramark) in negotiating against DNCY's contract-backed entitlement to receive fair value for its Other Property.  NPS also devised and implemented a plan to change the iconic names of properties in Yosemite, apparently in the mistaken belief that the name changes would drive down the value of DNCY's trademarks in those names and would create a public outcry that would force DNCY to relinquish the Other Property for less than its fair value, ultimately to the financial benefit of NPS and Aramark.

**A.      DNCY's efforts to ensure that the Prospectus included the fair value of DNCY's property.**

69.     On July 18, 2014, DNCY gave NPS documentation supporting the $98.6 million appraisal of its Other Property.

70.     NPS failed to respond for more than three months.  On September 3, 2014, DNCY sent a follow-up to its July 18 letter summarizing the correspondence to date and again noting the substantial discrepancy between the Prospectus's valuation of Other Property and the independent appraisals.  DNCY also pointed out that the uncertainty created by the $71 million disparity would make it impossible to evaluate bids fairly.  In order to ensure a fair competition for the new contract, DNCY requested that DNCY and NPS arrive at an agreed upon "fair value" to include in the Prospectus prior to the submission of proposals.

71.     NPS again failed to respond.  On October 13, 2014, DNCY sent NPS another letter—copying other prospective offerors—reiterating its request.

72.     On October 30, 2014, NPS finally responded with a letter stating that the independent appraisers' valuations were "so lacking in data as to be meaningless" and therefore the "reliability of the conclusions cannot be tested."

73.     DNCY requested a face-to-face meeting to discuss the valuation discrepancy and also offered to arrange for NPS to meet with the independent appraisers to assist NPS in understanding and assessing the appraisals.

74.     DNCY also offered that it would agree to be bound by the decision of a third party arbitrator pertaining to the fair value of the Other Property.

75.     NPS did not accept these offers.

**B.      Amendment 9 to the Prospectus.**

76.      Without responding to DNCY's offer, NPS issued Amendment 9 to the Prospectus on November 20, 2014.

77.      In Amendment 9, NPS inaccurately stated that DNCY had failed to notify the potential bidders of the valuation discrepancy.  NPS also incorrectly asserted that DNCY had not provided sufficient data to support the independent appraisals, even though NPS had rejected DNCY's offer to set up meetings between NPS and the appraisers.

78.      With respect to intellectual property, Amendment 9 failed to clearly state whether NPS recognized that intellectual property is included in the Other Property a new concessioner must purchase from DNCY.

79.      Instead, Amendment 9 stated that the next concessioner would have the option to change all of the famous, historic marks used in Yosemite, such as The Ahwahnee, Curry Village, and Wawona Hotel.

80.      On information and belief, NPS made this change to the Prospectus in the misguided belief and expectation that it would have a negative effect on the value of DNCY's trademarks.

81.      By exercising this option, NPS and the next concessioner would discard more than a century of accumulated goodwill in Yosemite, which through the stewardship of DNCY and its predecessors grew to iconic status not only in the United States, but around the globe.

82.      With regard to the non-routine capital improvements DNCY had made with its own funds (fixed capitalized assets), Amendment 9 indicated that NPS's position was that a new concessioner would not be required to purchase them, because DNCY had not labeled them as Possessory Interest and because they were part of DNCY's maintenance obligations. Amendment 9 did not acknowledge that only "routine maintenance" is non-compensable under

the Contract; nor did it mention that NPS had previously represented that DNCY would be compensated for capital improvements made with its own funds.

83.     In light of the indications in Amendment 9 that NPS desired greater detail regarding the appraised values of its Other Property, DNCY provided NPS with full copies of the appraisals it had obtained.  DNCY also reiterated its offer to arrange a meeting between NPS and the independent appraisers to discuss the valuations outside of DNCY's presence.

84.     DNCY also requested a copy of whatever documents NPS was using to support its valuation.  NPS refused.

85.     After months of requests, NPS agreed to meet with DNCY to discuss the pending valuation issues. The parties met on December 8, 2014.  At the meeting, however, NPS declined to discuss the fair value of DNCY's property and instead pressured DNCY to waive its rights to be compensated for intellectual property and capital improvements.  DNCY offered to submit the disputed issues to an expedited binding arbitration.  NPS did not accept this offer.

**C.     Amendment 12 to the Prospectus.**

86.     On December 22, 2014, NPS issued Amendment 12 to the Prospectus.

87.     In Amendment 12, NPS conceded that the next concessioner was required to purchase DNCY's "intellectual property, customer database, and internet related intangibles." NPS claimed that these assets were worth $3.5 million, but instructed potential offerors that they "may not rely" on NPS's valuation and instead "must conduct their own due diligence."

88.     NPS did not explain the basis for its $3.5 million estimate or address the discrepancy between that estimate and the much higher independently appraised value, nor did it provide a list of the intangible assets, even though comprehensive descriptions of such assets had been provided to NPS by DNCY.

89.     NPS later contended that its $3.5 million figure was supported by an independent analysis.  That analysis was dated January 2015, after NPS first adopted the $3.5 million valuation.

90.     To date, NPS has not provided DNCY with its purported independent analysis, even though DNCY has requested the analysis on multiple occasions and executed a non-disclosure agreement at NPS's request in order to obtain such analysis.

**D.     DNCY protests NPS's failure to include in the Prospectus the fair value of DNCY's Other Property.**

91.     DNCY lodged a bid protest with the Government Accountability Office ("GAO") contending that the Prospectus was improper because the $71 million discrepancy between the independent appraisals and NPS's estimate created uncertainty that would undermine the fair comparison of competing bids.  DNCY sought a recommendation from GAO that the Prospectus should be set aside until NPS and DNCY arrived at a fair value to include in the Prospectus.  GAO did not address the merits of DNCY's protest, but instead dismissed the protest on the ground that the dispute was fundamentally about the interpretation of Section 13(b) of the Contract, and therefore concerned NPS's administration of the Contract.

**III.    The New Contract and NPS's repudiation of its contractual obligation to require Aramark to purchase all of DNCY's Possessory Interest and Other Property.**

92.     On June 16, 2015, NPS announced it had selected Aramark for award of the New Contract.

93.     NPS granted Aramark the New Contract without requiring Aramark to first purchase and pay for all of DNCY's Possessory Interest and Other Property at fair value.  NPS granted Aramark the New Contract despite the absence of any purchase agreement with DNCY requiring Aramark to buy the Possessory Interest and Other Property for fair value.

94.     Instead, after selecting Aramark as the next concessioner, NPS announced unequivocally that it will not comply with its obligation under the Contract to require Aramark, as a condition to the granting of a contract to operate Yosemite, to purchase and pay fair value for all of DNCY's Possessory Interest and Other Property.

95.     On July 8, 2015, without having reached agreement with DNCY on fair value, and without Aramark having purchased any property, NPS sent a letter to DNCY stating that it had already "fulfilled" its obligations under Section 13(b) of the Contract.  NPS stated that "the fair value for [DNCY's] 'other property' ultimately will be determined through negotiation between [DNCY] and [Aramark]."  NPS stated that it "will not participate directly in negotiations" over the scope of Other Property or its fair value.

96.     NPS's statements in its July 8, 2015 letter were contrary to its contractual obligations.  The plain language of Section 13(b) obligates NPS to "require" Aramark "as a condition to" the New Contract "to purchase . . . and to pay the fair value" of DNCY's Possessory Interest and "all other property" DNCY "used or held for use" in Yosemite. NPS effectively attempted to shift onto DNCY the burden of extracting fair value for its Other Property from Aramark.

97.     In its July 8 letter, and in a subsequent letter dated August 21, 2015, NPS also declared unequivocally that it will not require Aramark to purchase DNCY's "fixed capitalized assets."  DNCY's "fixed capitalized assets" are the non-routine, "CIF eligible" capital improvements DNCY made with its own funds when CIF funds were unavailable, all of which were pre-approved by NPS and disclosed on DNCY's AFRs as compensable assets.

98.     NPS suggested that Aramark might have had to pay for these assets if DNCY had labeled them Possessory Interest, but claimed that they are now non-compensable because

DNCY called them "fixed capitalized assets" instead.  NPS also stated that DNCY is not entitled to compensation for any capital improvements related to maintenance, despite the fact that the Contract only precludes compensation for "routine" maintenance and expressly requires compensation for other capital improvements.

99.     NPS then asserted that Aramark did not need to buy all of DNCY's trade fixtures, such as lighting systems and HVAC units, even though the Prospectus expressly included trade fixtures in Other Property.

100.     On August 28, 2015, NPS sent DNCY and Aramark a letter unequivocally stating that, despite the terms of the Contract and the Prospectus, Aramark did not need to purchase any of DNCY's intangible property.

101.     DNCY is and has been prepared to sell all of its Possessory Interest and Other Property, including fixed capitalized assets and intangible property, to Aramark for fair value pursuant to the terms of the Contract, just as DNCY was required to buy all of Curry Company's assets.

## IV.     NPS reverses its position again and concedes that Aramark must purchase at least some of DNCY's trademarks.

102.     Upon NPS's unequivocal repudiations of its obligations under Section 13(b) of the Contract, DNCY commenced this lawsuit on September 17, 2015.

103.     A few days before the deadline for the Government's answer to the Complaint, NPS sent a letter dated December 29, 2015, to both DNCY and Aramark conceding that Aramark is required to purchase "certain intangible property" owned by DNCY, e.g., "certain trademarks, DNCY's customer database, and certain Internet-related intangibles."  NPS still claimed, however, that Aramark does not need to buy all of DNCY's intangible property, without identifying which assets NPS will not require Aramark to purchase.

104.    Even after DNCY requested clarification, NPS did not explain why some of

DNCY's intangible property should be included in Other Property, while some intangible

property should be excluded.  There is no such exclusion in the Contract, which includes "all

other property of [DNCY] used or held for use in connection" with DNCY's operations under

the Contract.

**V.      NPS changes the historic names in Yosemite, even after DNCY offered NPS a
         royalty-free license to use the names.**

105.    On January 2, 2016, DNCY offered NPS a royalty-free license for the duration of

this litigation to use the Yosemite-related trademarks, with the right to sub-license such use to

Aramark.  This arrangement would permit the continued use of the current marks while this

Court resolves the parties' disputes over "Other Property" and determines the amount of

compensation to which DNCY is contractually entitled.  Once the dispute over fair value was

resolved, all rights in the marks would be assigned to Aramark for fair value.

106.    NPS did not accept this offer.

107.    Instead, on January 14, 2016, NPS issued a press release stating that it was

changing certain names in Yosemite, such as The Ahwahnee, Curry Village, and the Wawona

Hotel, purportedly to avoid potential infringement claims by DNCY.

108.    For example, NPS announced that as of March 1, 2016, The Ahwahnee will go by

the name "Majestic Yosemite Hotel" and the Wawona Hotel will be called the "Big Trees

Lodge."

109.    In light of DNCY's offer to license the marks while this litigation goes forward

pending an assignment of all rights to the new concessioner for fair value, NPS had no need to

change the names in order to avoid potential infringement claims and was not compelled to do so

by DNCY.

110.    On information and belief, NPS announced these name changes for two reasons: (1) as an effort to reduce the value of DNCY's trademarks in the mistaken belief that Aramark will have to pay less money for the trademarks if NPS and Aramark decline to use them; and (2) to create public pressure on DNCY to accept less than fair value for its intellectual property in order to avoid reputational harm and the loss of future concession contract bids.

111.    This announcement was made as part of NPS's overall strategy to minimize the amount that Aramark would be required to pay DNCY for the Other Property, in order to frustrate DNCY's expectations under the Contract.

**VI.    DNCY has been damaged by NPS's breaches of the Contract.**

112.    DNCY has been and will be damaged by NPS's breaches of its contractual obligation to require Aramark to purchase all of DNCY's Possessory Interest and Other Property for fair value.

113.    DNCY has been and will be damaged by the affirmative actions NPS took solely for the purpose of frustrating DNCY's reasonable expectation that NPS would require Aramark to purchase all of DNCY's Possessory Interest and Other Property for fair value.

114.    DNCY's damages include the dollar amounts that DNCY would have received from Aramark in return for DNCY's Possessory Interest and Other Property had NPS complied with its obligations (1) to require Aramark to purchase that property for fair value as a condition to granting Aramark the New Contract at Yosemite and (2) not to take actions to frustrate DNCY's reasonable expectations under the Contract.  DNCY has also incurred costs that would have been unnecessary in the absence of NPS's breach, such as costs arising from DNCY's efforts to persuade Aramark to purchase and pay fair value for all of DNCY's property.

**VII.   DNCY was damaged by NPS's failure to evaluate Aramark's bid in accordance with the Prospectus.**

115.   DNCY submitted a bid for the New Contract. DNCY incurred substantial costs preparing its bid.

116.   In preparing the bid, DNCY relied upon the Prospectus, including the requirement that a new concessioner purchase all of DNCY's intangible property.  In particular, DNCY recognized that, if another offeror was awarded the New Contract, DNCY was entitled to be paid the fair value of its intangible property.  If DNCY was awarded the New Contract, however, DNCY would forego this opportunity to sell its intangible property and would be required to transfer its Yosemite-related intangible property to NPS for no additional compensation.

117.   DNCY's bid accounted for this opportunity cost by including it as a cost of performing the New Contract.  If the Prospectus had not stated that the new concessioner would be required to buy all of DNCY's intangible property, DNCY would not have included this opportunity cost in its financial analysis and could have submitted a bid that offered a higher franchise fee than that offered by Aramark.

## COUNT I

118.   DNCY incorporates by reference paragraphs 1 through 117 above as if fully set forth herein.

119.   Defendant's failure to require Aramark to purchase and pay fair value for DNCY's Possessory Interest and all other property DNCY uses or holds for use in connection with its Yosemite operations, as a condition to granting Aramark the New Contract, is a breach of the Contract.

120.     Defendant's unequivocal repudiation of its contractual obligation to require Aramark to purchase and pay for the Other Property as a condition to being granted the New Contract is a breach of the Contract.

121.     Defendant's breaches of the Contract have caused DNCY to suffer money damages and will continue to cause additional damages to DNCY, in an amount to be proved at trial.

## COUNT II

122.     DNCY incorporates by reference paragraphs 1 through 121 above as if fully set forth herein.

123.     The Contract incorporates an implied covenant of good faith and fair dealing.

124.     The implied covenant of good faith and fear dealing requires NPS to cooperate with DNCY in regard to the Contract and prohibits NPS from taking actions that frustrate DNCY's reasonably expected benefits under the Contract.

125.     NPS breached its implied covenant of good faith and fair dealing by failing to cooperate with DNCY to satisfy its obligations under Section 13(b) of the Contract and by taking actions for the purpose of depriving DNCY of the full benefits contemplated by the Section 13(b) of the Contract.  In particular, NPS took steps for the specific purpose of reducing the value of the property for which DNCY is entitled to compensation under the Contract, deliberately hampered and impeded DNCY's efforts to establish and recover the fair value of its property, and otherwise actively worked to frustrate DNCY's ability to obtain the benefits to which it is entitled under Section 13(b) of the Contract.

126.    Defendant's breaches of its obligation to act in good faith have caused DNCY to suffer money damages and will continue to cause additional damages to DNCY, in an amount to be proved at trial.

## COUNT III

127.    DNCY incorporates by reference paragraphs 1 through 126 above as if fully set forth herein.

128.    By issuing the Prospectus for the New Contract and inducing DNCY to incur substantial costs in the preparation of a conforming bid, NPS formed an implied-in-fact contract with DNCY to conduct a fair and honest competition for the New Contract that was not arbitrary, capricious, an abuse of discretion or in violation of law.

129.    The Prospectus was issued under the authority of the regulations set forth at 36 C.F.R. §§ 51.1–51.104, which are incorporated by reference into the Prospectus and control in the event of any inconsistency between the terms of the Prospectus and the regulations. Specifically, 36 C.F.R. § 51.4 requires NPS to award all concession contracts through a public solicitation process, which must describe the terms and conditions of the concession contract in a prospectus.  Additionally, 36 C.F.R. § 51.19 requires NPS to award a concession contract that does not materially amend or deviate from the terms of the prospectus.

130.    NPS breached its implied-in-fact contract with DNCY by materially deviating from the terms of the Prospectus after selecting Aramark for the award.  NPS's actions were arbitrary, capricious, an abuse of discretion and not in accordance with law.  Specifically, NPS's post-award failure to require Aramark to purchase all of DNCY's Other Property was contrary to the terms of the Prospectus.  Offerors such as DNCY could not reasonably anticipate that the requirement to purchase all of DNCY's Other Property would not be enforced post-award.  The New Contract between NPS and Aramark therefore violates 36 C.F.R. §§ 51.4 and 51.19,

24

because its terms are materially different from those of the Prospectus under which the offerors competed.

131. DNCY was prejudiced by NPS's actions. Had the Prospectus accurately stated NPS's intent not to require the new concessioner to buy all of DNCY's Other Property, the submitted bids would have been materially different and DNCY would have had a substantial chance of receiving the award.

132. NPS's breach of the implied-in-fact contract caused damages to DNCY in the form of bid and proposal costs, plus interest.

133. DNCY prays for judgment in its favor against the Government for damages in an amount to be determined at trial, together with costs, reasonable attorneys' fees and other relief as the Court deems just.

Dated: January 25, 2016     Respectfully submitted,


         _____/s   Thomas P. McLish
         Thomas P. McLish
         tmclish@akingump.com
         AKIN GUMP STRAUSS HAUER & FELD, LLP
         1333 New Hampshire Avenue, N.W.
         Washington, D.C. 20036-1564
         (202) 887-4000 (Tel)
         (202) 887-4288 (Fax)

         Jennifer A. Shah
         jshah@phillipslytle.com
         Nicolas J. Rotsko
         nrotsko@phillipslytle.com
         PHILLIPS LYTLE LLP
         125 Main Street
         Buffalo, NY 14203-2887
         (716) 847-8400 (Tel)
         (716) 852-6100 (Fax)

         Attorneys for DNC Parks & Resorts at Yosemite, Inc.